AMERICAN PNEUMATIC SERVICE CO. et al. v. W. V. SNYDER & CO.

(Circuit Court, D. New Jersey. September 20, 1909.)

PATENTS (§ 328*)—INFRINGEMENT—PNEUMATIC DISPATCH SYSTEM.
    The Bavier & Hawkes patent, No. 658,102, for a vacuo-pneumatic dispatch system, construed, and held not infringed.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit for infringement of letters patent No. 658,102, for a pneumatic dispatch system, granted to Charles S. Bavier and James R. Hawkes on September 18, 1900. On final hearing.

M. B. Philipp, for complainants.

James H. Griffin and Harry P. Simonton, for defendant.

LANNING, Circuit Judge. I do not find it necessary in this case to decide the questions raised by the defendants as to the validity of the complainants' patent. Assuming its validity, the defendants do not, in my judgment, infringe the patent by the manufacture and use of their device.

The complainants' patent, No. 658,102, dated September 18, 1900, is for improvements in vacuo-pneumatic dispatch systems; that is, in that class of pneumatic dispatch systems wherein a partial vacuum is maintained in the line of tubing by an exhauster or pump. The specification of the patent states that the object of the invention therein described is to attain the highest practicable economy in the operation of vacuo systems by reducing the duty of the exhauster to the minimum required for the service actually performed when the carriers are moved through the line. This reduction of duty is effected by providing a system wherein the line of transmission tubes is closed at all times when no service in the transmission of carriers is being performed, so that during such times the only duty required of the exhauster is to maintain a slight vacuum in the closed line. When

greater service of the exhauster is required for the transmission of carriers, a terminal air-inlet opens for the admission of air into the line in the rear of the carriers, and the exhauster, regulated by a governor, then speeds up and by increased exhaustion of the air in front of the carriers enables the air admitted in the rear to force the carriers through the line. The following figures illustrate the operation of the complainants' patented device:

Fig.1

Fig.2

Fig.3

Fig.4

In Fig. 1, the exhauster, 2, is at the end of the looped line of tubing, 1, most remote from the end provided with the terminal air-inlet, 3. Dispatch inlets—that is, inlets where carriers are inserted in the line —are represented at 20, each having a door, 24; and discharge outlets—that is, outlets where the carriers are discharged from the line —are represented at 22, each having a door, 26. Each of the doors to these inlets and outlets is closed by a spring. Door 24 is opened manually or otherwise when a carrier is inserted, and door 26 is opened by the impact of the discharging carrier. Door 24 is closed immediately after the carrier is inserted, and door 26 immediately after it is discharged. It will be observed, then, that during the whole of the time the line is not in service it is closed between the exhauster, 2, at one end; and the air-inlet, 3, at the other end. Assuming the exhauster not to be in operation, and the air in the line of tubing not to have been to any extent drawn from it, the ball-valve, 10 (which is connected by a rod with a perforated piston head as shown in cylinder 4 of Fig. 2 and in Fig. 3), occupies a position below the conical valve-seat, 8. If the exhauster, 2, be now put into operation, it draws the air from the tubing, 1, to such an extent as to produce a partial vacuum therein. The piston head in cylinder 4 is thereupon forced up by the pressure of the air passing into the lower part of the cylinder through the conical valve-seat, 8, and ball-valve 10 is thereby lifted to its seat in 8. In this manner air-inlet 3 is closed, and it remains closed so long as exhauster 2 keeps the air in the tubing sufficiently rarified to enable the external pressure to hold 10 in its seat, 8. Now, if door 24 be opened, air will be admitted to the line through the door, and valve 10 will immediately drop by gravity. If a carrier be then inserted at 24, and the door closed behind the carrier, air will be admitted to the line through the air-inlet at 8, and the perforated piston head in cylinder 4. The perforated piston head is provided with a damper, shown in Fig. 3, by which the admission of air into the line may be regulated. As the exhauster, 2, exhausts the air in front of the carrier, the carrier is forced through the line by the pressure of the air behind it until its discharge at 26. When the carrier is discharged at 26, the door at 26 being immediately closed after the discharge by means of a spring or otherwise, exhauster 2, no longer required to overcome the added resistance of a carrier in the line, exhausts the air from the line to an extent sufficient to cause valve 10 again to take its seat in 8, and thus to close the system until another carrier is inserted. With this brief description the two claims of the patent will, perhaps, be understood. They are:

"1. A vacuo dispatch system, characterized by the combination of a line of tubing, an exhauster operatively connected therewith, and a terminal air-inlet having a closure, which automatically shuts the air-inlet when no carrier is being dispatched and automatically opens same when a carrier is being dispatched, substantially as described.

"2. The combination in a vacuo dispatch system of a line of tubing, an exhauster operatively connected therewith, dispatch inlets and discharge outlets normally closed, and a terminal air-inlet on said line, remote from said exhauster, provided with a closure which is arranged to automatically shut the said terminal air-inlet when no carrier is being dispatched and automatically open it when a carrier is being dispatched, substantially as described."

The following figure illustrates the defendants' device:

Fig. 1.

When the valves of·this line of tubing are all closed, the exhauster, connected with drum 2, draws a portion of the air from, and thereby creates a partial vacuum in, tubes 1b, 1a, and 1, and in that portion of cylinder 6 above the fixed perforated diaphragm, 6b. A hole in the bottom of cylinder 6 admits air into the lower portion of the cylinder, and the air pressure holds the piston head, 6a, up against the perforated diaphragm, 6b. The exhauster also draws a portion of the air from that part of cylinder 4 which is below piston head 7 through tube 2a, drum 2b, tube 2c, and drum 2. If, now, a carrier be inserted at 3, it strikes lever 18, opens valve 17, admits air into tube 16 and that part of cylinder 4 above piston head 7, and forces piston head 7 (which is connected with valve 10 by suitable rods) down upon the tension spring 11, thereby drawing open valve 10, and permitting the carrier to be transmitted by the pressure of the air behind it through tube 1 until it is discharged from the tube at valve 27. Immediately after the carrier has passed lever 18, valve 17 closes by means of a spring or other device, and no more air is admitted through tube 16 into the upper part of cylinder 4. The exhauster draws from the upper part of cylinder 4 the air thus confined in that part by means of by-pass 15, which connects the part of cylinder 4 above piston head 7 with the part below it. The speed with which the air in cylinder 4 is withdrawn is regulated by timing-valve 15a. As the air is exhausted from cylinder 4, piston head 7 is gradually forced up by tension spring 11, and valve 10 is thereby gradually closed. By proper adjustment of the timing-valve 15a, valve 10 will be closed about the time or just after the carrier has been discharged at valve 27. By this arrangement, so long as the carrier is between valves 10 and 27, valve 10 is open, admitting air to drive the carrier on to the exit at valve 27. When a carrier is inserted at 24a, the air admitted into the tubes at the time of the insertion destroys the partial vacuum in tube 6 above the perforated diaphragm, 6b, and allows the piston, 6a, to drop by gravity. Piston rod 13a passes in its descent through an aperture in the bottom of tube 6, strikes lever 13, opens valve 12, and thereby admits air to the upper part of cylinder 4, forcing down piston head 7, and again drawing open valve 10, and again admitting air into the line of tubing sufficient to drive the carrier from 24a to its outlet, 27a. In the meantime valve 10 has been gradually closed, as when the carrier was driven from 3 to 27.

The first two elements of the combination described in claim 1 of the patent in suit, a line of tubing and an exhauster operatively connected therewith, and the first three elements of the combination described in claim 2, a line of tubing, an exhauster operatively connected therewith, and dispatch inlets and discharge outlets normally closed, are found in the defendants' device. The remaining element in each of these claims, a terminal air-inlet with a closure which automatically opens and shuts the air-inlet, I do not find in the defendants' device. The terminal air-inlet of the defendants' device is at valve 10. Valve 10 is its closure. If one inserts a carrier into orifice 3 and trips lever 18, valve 10 will be immediately opened; but it will not be opened by admitting air into the line of tubing through which the carriers are

transmitted, and thereby producing an equality of air pressure on each side of valve 10, so that it will fall by gravity, as in the case of the patent in suit. It will be pulled open, without the previous admission of air into the line of tubing through which the carriers are transmitted, by a mechanism wholly external to such line of tubing; that is, by piston head 7, which, being operatively connected with valve 10, is forced down by the admission of free outside air through tube 16 into the upper part of cylinder 4. And if one inserts a carrier at 24a, piston 6a will drop, and valves 12 and 10 will be opened; but, while in that case air will be admitted into the line of tubing through which carriers are transmitted, valve 10 will be opened, not by the mere fact of such admission and the consequent equality of air pressure on each side of valve 10, and the law of gravity, as in the case of the patent in suit. It will again be pulled open by piston head 7, which is forced down by the admission of free outside air through valve 12 into the upper part of cylinder 4.

When a carrier is inserted at 3, and valve 10 is opened, it is very nearly closed again by tension spring 11; and when a carrier is inserted at 24a, while the admission of air into the line of tubing produces the condition which allows piston 6a to fall, and valves 12 and 10 to be opened, valve 10 is again very nearly closed by the tension spring. I am satisfied that it is not completely closed by the spring. The rods connecting piston head 7 with valve 10 are so constructed as to allow a little freedom of movement by valve 10; and in consequence of this freedom, when valve 10 has been almost completely closed by the action of spring 11, I have no doubt that the greater air pressure on the side of valve 10 next to the orifice, 3, will aid in closing it. Nevertheless, it is not closed "substantially as described" in the specification of the patent in suit.

Ball-valve 10 of the patent in suit, which is the closure that automatically shuts the terminal air-inlet when no carrier is being dispatched, and automatically opens it when a carrier is being dispatched, is operated exclusively by regulating the degrees of air pressure in the line of tubing through which carriers are transmitted. Valve 10 of the defendants' device, which is the closure that shuts and opens the terminal air-inlet of that device, is not so operated. Each of the combinations described in claims 1 and 2 of the patent in suit has, as one of its elements, a terminal air-inlet having a closure which automatically shuts the air-inlet when no carrier is being dispatched and automatically opens it when a carrier is being dispatched. The combination in the defendants' device has, as one of its elements, a terminal air-inlet having a closure which shuts the air-inlet, not in any proper sense automatically, but almost wholly because it is forced into the air-inlet by a spring, and which opens the air-inlet, not automatically, but because it is pulled out of the air-inlet by a mechanism specially devised for that purpose. The differences between the combinations of claims 1 and 2 of the patent in suit and the combination of the defendants' device cannot be explained on any theory of the substitution of mechanical equivalents. The combinations are essentially unlike, and there is no infringement.

It follows that the bill of complaint must be dismissed, with costs.